**Mrs. Crete DYE, Plaintiff,**

v.

**DUNCAN, DIECKMAN & DUNCAN MINING CO., Inc.; Donald S. Duncan and wife, Mrs. Donald S. Duncan; J. R. Wood and wife, Mrs. Lola Wood; W. H. (Bill) Hargus and wife, Mrs. W. H. Hargus; Bill Hargus and wife, Mrs. Bill Hargus; Luke Lawrence; Charles W. Ratliff and wife, Mrs. Susie Ratliff; J. D. Hillard; W. B. Price and wife, Mrs. Pauline Price; J. F. Grant and wife, Mrs. Clara Grant; S. W. Chapman and wife, Mrs. Christine K. Chapman; Mr. and Mrs. Howard House, Defendants,**

**O. A. Logan, Cross-Defendant.**

**Civ. A. 1354.**

United States District Court
W. D. Arkansas,
Fort Smith Division.

Aug. 6, 1958.

Dobbs, Pryor & Dobbs, Ft. Smith, Ark., Nabors Shaw, Mena, Ark., for Duncan, Dieckman & Duncan Mining Co. and Donald S. Duncan and wife.

Bethell & Pearce, Ft. Smith, Ark., for W. H. Hargus and wife, Charles W. Ratliff and wife, J. D. Hillard.

Collins, Edwards, Core & Collins, De-Queen, Ark., for Luke Lawrence, J. R. Wood and wife.

Shaver, Tackett & Jones, Texarkana, Ark., for S. W. Chapman and wife.

Kenyon F. Lee, Los Angeles, Cal., John E. Harris, Ft. Smith, Ark., Jerry C. Witt, Mount Ida, Ark., for plaintiff.

JOHN E. MILLER, District Judge.

This is a mining case involving conflicting claims of four sets of parties. Each party contends that his or her claims are valid and have been "jumped" by the opposing parties.

After the filing of numerous pleadings and motions, the case finally progressed to trial on May 12, 1958. The trial proceeded until May 16, 1958, when it became necessary for the Court to postpone further proceedings until June 16, 1958. The trial was resumed on June 16, and was finally concluded on June 18, 1958. At the conclusion of the trial the Court took the case under advisement. On June 25, 1958, the defendants, J. R. and Lola Wood and Luke Lawrence, filed a motion to re-open the evidence for the limited purpose of introducing a photostatic copy of Exhibit No. 24, which was placed in evidence by plaintiff during the trial of the case. The Court granted the motion, and the photostatic copy of the exhibit (as it appeared when presented to the drawee bank) has now been received and is a part of the evidence.

Briefs were filed by the parties in support of their contentions, and the Court, having considered the pleadings, evidence, and briefs of the parties, makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

Findings of Fact

1.

The plaintiff, Mrs. Crete Dye, is a citizen and resident of the State of California. All of the defendants are citizens and residents of the Fort Smith Division of the Western District of Arkansas. The amount in controversy, exclusive of interest and costs, exceeds the sum of $3,000.

2.

The nature of the case makes the dates of various instruments and activities of particular importance, and for that reason the Court will attempt to state most of its Findings of Fact in chronological order.

1951

In June of 1951, Archie B. Pickell (plaintiff's predecessor in title) discovered a lode of manganese ore extending in an east-west direction across Section 36 and part of Section 35 of Town-

ship 3 South, Range 28 West, in Polk County, Arkansas. (Section 35 is adjacent to and directly west of Section 36.) He employed several men to assist him in exploring and ascertaining the extent and value of the ore.

#### 1952

Pickell decided to locate certain claims in Sections 35 and 36, and employed men to mark the boundaries, blaze trees, brush the lines, place rock monuments at the corners of the claims, and place location notices on the claims. In this manner Pickell located his claims 12 to 19, inclusive, and on May 7 and 8, 1952, he filed location notices in the office of the Circuit Clerk and Recorder of Polk County, Arkansas. The location notice of Pickell's claim No. 12 provides that it is located "on the Missouri lode or vein beginning at Place of Notice and running 1,500 feet west and 300 feet on each side of the center of the lode or vein, including all dips, angles and parallel veins within said boundary. Corners: N.E. stone, N.W. stone, S.W. stone, S.E. stone, bounded beginning at center of Sec. 36, Twp. 3 South, Range 28 West and running west 1500 feet then North 600 ft., then East 1500 ft., then South 600 ft. to place of beginning, Situated in Section 36, Township 3 South, Range 28 West, ——— Mining District, County of Polk, State of Arkansas." Pickell's claims 13, 14, 15, and 16 were adjacent to claim 12 and to each other and were located west of claim 12. In other words, Pickell's claims 12 to 16, inclusive, ran from the center of Section 36 in a westerly direction through the west half of Section 36 and most of Section 35. Claim 12 was located entirely in Section 36; claim 13 mostly in 36 but partly in 35; claims 14, 15, and 16 entirely in 35. All the claims were 600 feet wide north and south, and 1,500 feet long east and west. Pickell's claim 17 was directly north of and adjacent to claim 16; claim 18 was directly north of and adjacent to claim 15; and claim 19 was directly north of and adjacent to claim 14. Claims 17, 18, and 19 were entirely in Section 35

and were each 600 feet wide north and south, and 1,500 feet long east and west.

Shortly after the notices were filed, Pickell's employees began surveying the claims and doing additional work marking the boundaries, brushing the lines, and posting notices. Pickell's employees did a substantial amount of discovery and assessment work on the eight claims.

Pickell was of the opinion that the vein or lode of ore was in the center of his claim No. 12 and was 300 feet north of the center of Section 36. He was positive in his testimony that the south line of his claim 12 was on the east-west center line of Section 36.

#### 1953

On June 30, 1953, Pickell filed an affidavit of assessment work, stating that he had paid $18,597 "for assessment and development work on my Mining Claims Nos. 12, 13, 14, 15, 16, 17, 18, 19 in Sections 35 and 36, Twp. 3 S., Range 28 W.; Also Claims Nos. 1, 5, 6, 7, 8, 9, 10, 11, 12, 13 in Sections 7, 8 and 9, Twp. 4 S., R. 29 W.; Also Claim No. 1 in Sec. 11, Twp. 3 S., R. 30 W. This work consists of road building, pit excavations, and machine installations, and was done between July 1, 1952, and June 30, 1953."

Pickell's employees did in fact do assessment work of a reasonable value of $100 for each of the claims 12 to 19, inclusive, for the assessment year ending July 1, 1953, at 12 o'clock meridian.

In the fall of 1953 the defendant, Charles W. Ratliff, was hunting in Sections 35 and 36 and discovered some manganese ore. He took no action concerning the ore at that time but merely noted its presence.

During the latter part of 1953 Pickell had one road built extending toward his eight claims. However, the road was not built completely up to the area of the claims.

#### 1954

In the spring of 1954 Pickell continued to employ workers to perform discovery and assessment work on his

eight claims. The assessment work done by his employees had a reasonable value in excess of $100 per claim for the assessment year ending July 1, 1954, at 12 o'clock meridian.

On May 10, 1954, Pickell and his wife, by quitclaim deed, conveyed his claims 12 to 19, inclusive, to his son-in-law, W. B. Alexander.

Also during the spring of 1954 Charles W. Ratliff, J. D. Hillard, and John M. Walker made investigations in Sections 35 and 36 where Ratliff had noticed the ore the year before. As a result of their investigations they located four claims and filed location notices on May 17, 1954. Claim No. 1 located by Ratliff, with Hillard and Walker as witnesses, began at the northeast corner of the SE¼ of the NW¼ of Section 36, Township 3 South, Range 28 West, in Polk County, Arkansas, and then ran 1,500 feet west, 600 feet south, 1,500 feet east, and 600 feet north to place of beginning. Claim No. 2, located by Walker, with Hillard and Ratliff as witnesses, was adjacent to and west of Claim No. 1. It was 600 feet wide north and south, and 1,500 feet long east and west. Claims Nos. 3 and 4, located by Hillard, with Walker and Ratliff as witnesses, were located directly south of and adjacent to claims 1 and 2 above mentioned. Claim 3 was directly south of claim 1, and claim 4 was directly south of claim 2.

On July 1, 1954, W. B. Alexander filed mining claim location notices on claims 12 to 19, inclusive. These notices covered exactly the same territory covered by Pickell's notices. Alexander was never on the particular claims and executed the notices at the request of Pickell. It was not completely clear from the evidence for what purpose the notices were filed.

In the fall of 1954 Pickell continued to employ men to do discovery and assessment work on claims 12 to 19, inclusive, on behalf of Alexander.

On December 3, 1954, Warren B. Alexander and wife leased claims 12 to 19, inclusive, to O. A. Logan. Logan mined in the area for about two weeks.

1955

On January 12, 1955, the defendants, J. R. Wood and Luke Lawrence, filed location notices covering their claims 1 to 6, inclusive. Wood and Lawrence claim No. 1 began at the quarter section corner on the east side of Section 36 and ran north 300 feet, west 1,500 feet, south 600 feet, east 1,500 feet, and north 300 feet to place of beginning. Their claims 2, 3, and 4 were adjacent to claim 1 and to each other and lay west of claim 1. Claims 1, 2, 3, and 4 were each 600 feet wide north and south and 1,500 feet long east and west. The four claims extended across the center of Section 36 and partly into Section 35. Wood and Lawrence claim 5 was directly north of their claim 3 and was located in Section 36. Their claim 6 was directly north of claim 4, and was partly in Section 36 and partly in Section 35. Prior to filing the notices Wood and Lawrence had discovered the vein of ore, had laid out and marked the boundaries of their claims 1 to 6, inclusive, and had posted notices.

In the latter part of January 1955, W. D. Price conferred with Wood and Lawrence with reference to mining ore from Wood and Lawrence claims 1 to 6. Wood and Lawrence gave him permission to mine on the claims, and Price began mining operations in the latter part of January. On February 19, 1955, a written lease was entered into between J. R. Wood and wife and Luke Lawrence, as lessors, and J. F. Grant and W. D. Price, as lessees, with respect to the six claims above mentioned. Price carried on mining operations for a while and then on March 19, 1955, Price conveyed his interest in the lease to S. W. Chapman and Christine K. Chapman. Price continued mining on the claims and particularly on claim 5 throughout the year 1955.

On April 2, 1955, W. B. Alexander wrote a letter to O. A. Logan stating that he was cancelling Logan's lease on

certain claims, including Alexander's claims 12 to 19, for failing to begin mining operations within the time required by the lease. Logan denied ever receiving a copy of this letter.

On April 14, 1955, O. A. Logan executed a lease to the Mena Mining Corporation covering, among others, claims 12 to 19, above mentioned. No action was ever taken under this lease.

In May of 1955, Price hired a bulldozer operator to build a road to Wood and Lawrence claim 5.

On June 6, 1955, Ratliff, Hillard, and Walker executed mining leases to Price and Grant. At the time these leases were executed Price was not aware that the Ratliff, Hillard, and Walker claims conflicted with the Wood and Lawrence claims, and upon learning of this fact, Price and Ratliff discussed the advisability of instituting a quiet title action. Ratliff discussed the matter with an attorney, but the suit was never filed.

Price did not purport to act under the leases from Ratliff, Hillard, and Walker, and Price did no assessment work on their behalf.

On June 28, 1955, Price, on behalf of Wood and Lawrence, filed his affidavit of assessment work stating that at least $1,600 worth of labor and money was expended on 16 claims, including claims 1 to 6 of Wood and Lawrence, heretofore mentioned. As a matter of fact, Wood and Lawrence, through Price, performed labor of a reasonable value in excess of $100 for each of the six claims during the assessment year ending July 1, 1955, at 12 o'clock meridian.

In the spring of 1955 Pickell, on behalf of Alexander, continued to employ men to do assessment work on claims 12 to 19, and the work done had a reasonable value in excess of $100 for each of the eight claims during the assessment year ending July 1, 1955, at 12 o'clock meridian.

On June 30, 1955, Pickell, as agent of Alexander, filed an affidavit of assessment work as to claims 12 to 19, stating that he had constructed 1–1/4 miles of road to the property and in the eight claims and had installed mining machinery worth $3,000.

In July or August 1955, L. D. Priddy and Homer Legate, two of Pickell's employees, were working on claims 12 and 13. They ran the north line of claim 12, and discovered that it was south of the pit where the Duncan mine is now located. They quit the work because they thought they had lost the line.

In August 1955, Mr. and Mrs. Chapman joined with Grant and Price in mining on the Wood and Lawrence claims. They operated under the name of Triangle Mining Company.

On August 29, 1955, C. W. Ratliff filed an affidavit of assessment work stating that he had done at least $100 worth of work on claim 1 between May 17, 1954, and May 17, 1955. On the same day J. D. Hillard filed an affidavit of assessment work, stating that he had done at least $100 worth of work on claim 3 between May 17, 1954, and May 17, 1955. In the affidavit (defendant's Exhibit 47) the figure "4" appears in ink immediately after the typewritten figure "3", and it is probable that the affidavit was intended to cover Hillard's claim 4 as well as his claim 3.

During the assessment year ending July 1, 1955, at 12 o'clock meridian, Ratliff, Hillard, and Walker did in fact do assessment work worth at least $100 for each of their claims.

During the fall of 1955 Pickell continued to employ men to do assessment work on claims 12 to 19.

### 1956

During the spring of 1956 the Chapmans and Price and Grant continued mining operations on Wood and Lawrence claims 1 to 6. Apparently these operations were not too successful, although some ore was mined and sold and some royalties were paid to Wood and Lawrence.

On May 19, 1956, Warren B. Alexander and wife by quitclaim deed conveyed

their interest in claims 12 to 19 to the plaintiff, Crete P. Dye.

On June 26, 1956, J. R. Wood filed an affidavit of assessment work on behalf of Wood and Lawrence claims 1 to 6, as well as other claims, stating that at least $1,600 worth of labor and money was expended upon the sixteen claims listed. Wood and Lawrence, through the Chapmans and Price, did in fact perform labor of a reasonable value in excess of $100 for each of their six claims during the assessment year ending July 1, 1956, at 12 o'clock meridian.

During the assessment year ending July 1, 1956, at 12 o'clock meridian, Ratliff, Hillard, and Walker did not do assessment work having a reasonable value of $100 for each of their claims, and they filed no affidavits of assessment work for this assessment year.

On July 2, 1956, Mr. and Mrs. Chapman leased their interest in the Wood and Lawrence claims 1 to 6, inclusive, to the defendant, Duncan, Dieckman & Duncan Mining Company.

On October 17, 1956, Pickell, as agent of Alexander, filed an affidavit of assessment work stating that he had done the required assessment work on claims 12 to 19 for the year July 1, 1955, to June 30, 1956. Pickell did in fact employ men who did assessment work having a reasonable value in excess of $100 for each of the eight claims.

On October 24, 1956, C. W. Ratliff and wife leased Ratliff's claim 1 to Will H. Hargus, Jr. On October 27, 1956, J. D. Hillard leased his claims 3 and 4 to Will H. Hargus, Jr., and on the same date John M. Walker by quitclaim deed conveyed his claim 2 to Will H. Hargus, Jr.

In October of 1956 Robert B. McElwain, a geologist, was working for the Duncan, Dieckman & Duncan Mining Company (hereinafter referred to as Duncan). His investigation led him to believe that there was no valid claim covering the area being mined by Duncan, and he suggested that Duncan file claims of its own as a protective meas-ure. At his suggestion three claims were surveyed and properly marked by Duncan encompassing the vein or lode of the ore. Notices were placed on the claims and location notices were filed by Duncan on November 2, 1956. The location notices filed by Duncan read as follows:

"Notice of Location

"Notice is hereby given that on November 1, 1956, the undersigned, Duncan, Dieckman and Duncan Mining Company, Inc., located Missouri Mountain Claims Numbers one, two, and three in accordance with the Federal Mining Laws, upon the following described property, and that they claim all veins, lodes, spurs, angles and dips within and appurtenant to said claims: Beginning at a General Land Office Survey corner in the middle of the North boundary of Section 36, Township 3 South, Range 28 West, Polk County, Arkansas; thence South on a true line 1,685.52 feet, thence South 84 degrees, East 590.36 feet to the Northeast corner of claim No. 1. Claim No. 1 is described as follows: From the Northeast Corner, located as above described, go South 6 degrees, West 600 feet, thence North 84 degrees, West 1500 feet, thence North 6 degrees, East 600 feet, thence South 84 degrees, East 1500 feet to the point of beginning. All compass directions given in this notice are true bearings.

"Claim No. 2 is described as follows: Beginning at the Northeast Corner of Claim No. 1, go South 84 degrees, East 1500 feet, thence South 6 degrees, West 600 feet, thence North 84 degrees, West 1500 feet, thence North 6 degrees, East 600 feet to the point of beginning.

"Claim No. 3 is described as follows: Beginning at the Northwest Corner of Claim No. 1, go South 6 degrees, West 600 feet, thence North 84 degrees, West 1500 feet, thence North 6 degrees, East 600 feet,

thence South 84 degrees, East 1500 feet to the point of beginning.

"The claim boundaries are well blazed and pointed. Stakes are set at all claim corners.

"Dated November 2, 1956."

On November 5, 1956, plaintiff, Crete P. Dye, by quitclaim deed conveyed to Paul Ferguson a 1/10th interest in claims 12 to 19, heretofore referred to. On November 9, 1956, Mrs. Dye conveyed to Ferguson a 4/10ths interest in claims 12 to 19. Apparently these conveyances were either made as security for or in payment of money owed Ferguson by Mrs. Dye for bulldozer and other work. On November 19, 1956, Paul Ferguson and wife by quitclaim deed reconveyed the 5/10ths interest in claims 12 to 19 to the plaintiff, Mrs. Dye. Ferguson testified that the conveyance was made because he learned that the claims would be subject to litigation and that he did not want to get involved.

On November 12, 1956, an agreement was entered into between J. F. Grant and Mr. and Mrs. Chapman, dissolving the Triangle Mining Company and conveying to the Chapmans all of Grant's interest in the property owned by the partnership.

On November 15, 1956, Will H. Hargus, Sr., wrote a letter to Duncan advising that he ·had purchased from Walker and leased from Ratliff and Hillard four mining claims in Sections 35 and 36, and stating that he planned to file suit to quiet title to the claims. Hargus also suggested that Duncan pay no further royalty to any of the claimants until final determination of title. Hargus further stated:

"We have no objection to the continuation of your mining operation and are willing to wait until determination of the title on any royalty. We would not want to see you pay royalty twice but feel that this will occur if pending final determination of title you pay same to others."

On November 16, 1956, Wood and Lawrence and Duncan entered into an agreement whereby Duncan agreed to continue to pay royalties to Wood and Lawrence with the understanding that the latter would hold ·Duncan harmless from having to pay the royalty twice, apparently in the event the Wood and Lawrence claims should be declared invalid. The agreement further provides that Duncan by the filing of its three claims is not claiming adversely to Wood and Lawrence and will not assert its claims as against Wood and Lawrence.

In December of 1956 Pickell, acting for plaintiff, employed Darrel Evans to survey plaintiff's claim 12. Pickell was attempting to determine whether the mine being operated by Duncan was on plaintiff's claim 12. Evans surveyed the claim and determined that the north line of claim 12 was approximately 8 to 10 feet south of the bank of the pit being mined by Duncan and about 20 to 30 feet south of the vein of ore. Pickell told Evans that he thought the survey was correct.

Subsequently, Pickell conferred with Byron J. Phegley, Duncan's superintendent, and informed him that one of Duncan's buildings and some of Duncan's machinery were on Pickell's claim. Pickell told Phegley that Duncan was not mining on his (Pickell's) claim and should not do so. As a result of this conversation, Duncan moved its building and machinery to the north and was required to change some of its mining procedure.

During the last half of 1956 Duncan conducted extensive mining operations on Wood and Lawrence claim 5 under its lease from the Chapmans.

Wood and Lawrence received about $1,200 in royalties from Duncan during the year 1956.

### 1957

In January, February, and March of 1957 Duncan continued to pay royalties to Wood and Lawrence. These royalties amounted to about $950 each.

On May 9, 1957, the instant suit was filed.

On June 29, 1957, Paul Ferguson filed an affidavit of assessment work on behalf of plaintiff covering claims 12 to 19, stating that he had performed $100 worth of assessment work to be applied on each of the claims. Assessment work was in fact done on behalf of plaintiff for the assessment year ending July 1, 1957, at 12 o'clock meridian, of a reasonable value of $100 for each of her eight claims.

On July 1, 1957, Duncan filed an affidavit of assessment work, stating that it had done the assessment work required by law for the assessment period ending July 1, 1957, on the six Wood and Lawrence claims leased by the Chapmans to Duncan. Duncan in fact did assessment work on the claims of a reasonable value in excess of $100 for each claim.

During the assessment year ending July 1, 1957, at 12 o'clock meridian, Duncan did assessment work on its own claims 1 to 3, having a reasonable value in excess of $100 per claim.

On October 25, 1957, the plaintiff, Crete Dye, wrote a letter to Darrel Evans requesting a statement from him concerning the survey made on claims 12 and 13 in 1956, giving details as to markings, etc., he found at that time.

### 1958

On March 4 through March 16, 1958, James D. Mickle, a registered engineer, surveyed certain portions of Sections 35 and 36 for Duncan and prepared maps showing the results of his survey.

On March 17 to March 22, 1958, Rohn F. Drye, Jr., a registered engineer, surveyed certain portions of Sections 35 and 36 for plaintiff and prepared a map showing the results of his survey.

On March 28, 1958, Duncan ceased mining the claims in question because the Government stopped buying the ore pending determination of the title.

On April 2, 1958, Howard G. Schoenike, a mining geologist, made certain studies for plaintiff and prepared a map of his findings. Also in April 1958, Theo Rosemour surveyed certain portions of Sections 35 and 36 for Wood and Lawrence and prepared a map showing the results of his survey.

The maps or plats prepared by the witnesses, together with the other evidence in the case, establish that the mine or pit developed and worked by Duncan is located near the center of Wood and Lawrence claim No. 5; near the center, north and south, of Duncan claims 1 and 3; in the south portion of claim 1 of Ratliff; and in the north portion of claim 3 of Hillard. The mine or pit is not located on plaintiff's claim 12 but is slightly north of said claim.

The survey of the engineer, James D. Mickle, established the true center of Section 36, and plaintiff's claim 12 extends 600 feet north of said center, thence 1,500 feet west, 600 feet south, and 1,500 feet east to point of beginning.

### 3.

The terrain in the area where these claims are located is very rugged, and the slope in some places is from 400 to 700 feet per quarter mile. Wood and Lawrence have filed almost a hundred claims in this area, and Pickell has also filed claims in addition to the ones involved in this action.

Hargus has been purchasing ore from Duncan, and prior to that purchased some ore from Price. The price of good ore may run as much as $84 a ton and lower grade ore may be as low as $30 a ton.

In the area involved in this action the manganese ore is fairly widely scattered, and at least some ore was discovered by the various claimants on each of the claims. However, it appears that the principal vein of ore is the one which has been mined by Duncan.

### Discussion

This case stands unprecedented and unparalleled in the experience of this Court. After the filing of many pleadings, motions and other preliminary matters, the case finally proceeded to

a trial which lasted eight days. Eighty-one exhibits, many of them multiple exhibits, were introduced and 35 witnesses testified. Approximately 15 briefs were filed by the parties, before, during and after the trial.

The inconsistencies and conflicts in the evidence are too numerous to list, too oft-repeated to overlook, and too pyramided to understand. It would probably be an exceedingly charitable statement if the Court said that there were many obvious "mistakes" in the testimony of some of the witnesses. When the hour of decision is reached, the Court finds itself in the unenviable position of attempting to reconcile irreconcilable conflicts and to determine the true facts in the case. The task of the Court is rather well stated in one of the briefs filed in the case, and in view of the appropriateness of the remarks, the Court is taking the liberty of quoting the following from the brief:

"This case can be approached from several sides, but shot throughout it all is the leavening factor that the court must determine who is to be believed on each salient and critical point. Unless that be first done, the case will not be still long enough to be decided. Rather, when pressed at one point it will pop up at another. Probably, with all of the galaxy of human traits that affect the parallelism and lack of it, between the actual manner of occurrence of human events and the subsequent description thereof by participants and observers, none of the witnesses is either altogether wrong or altogether right. But there remains the fact that a witness can be wrong so many times that no confidence can be placed in anything he says merely because he said it."

■■ To the best of its ability the Court has considered, sifted, and weighed the evidence in the case and has made its findings of fact in accordance with its best judgment. There is no particular mystery concerning the law to be applied to the facts found by the Court. A valid location of a mining claim requires three things, i. e., discovery of a vein or lode of ore, marking of the boundaries of the claim encompassing the lode of ore, and the giving of notice of the location. Featherston v. Howse, D.C.W.D.Ark., 151 F.Supp. 353, 358; George Rose Smith, "Arkansas Mining and Mineral Law," pp. 18–19. To avoid forfeiture of a claim the locator or his agent must perform the annual labor. 30 U.S.C.A. § 28.

In the present case the primary question is which, if any, of the parties properly located his, its, or their claim or claims and kept them alive by doing the required assessment work; further, if more than one of the parties performed the required acts, which was the first to properly locate his, its, or their claim or claims.

## Plaintiff's Claims

The Court has found as a fact that plaintiff's predecessor in title, Pickell, was the first to locate claims in the area involved, and that he and his successors performed the required assessment work for each assessment year thereafter. The evidence on this point, as on all material points in the case, was conflicting, but the Court has concluded that plaintiff established this portion of her case by a preponderance of the evidence.

■ The only parties claiming to have located prior to Pickell are Wood and Lawrence, and the evidence is wholly insufficient to establish a valid location on their part prior to the location of Pickell on May 7 and 8, 1952. Moreover, it was further established that custom and usage in Polk County requires the recording of location notices (compare, Thompson v. Underwood, 138 Ark. 323, 328, 211 S.W. 164), and any location made by Wood and Lawrence prior to the time they filed location notices on January 12, 1955, would have been completely ineffective except possibly as against persons having actual knowledge of the location. See, George

Rose Smith, "Arkansas Mining and Mineral Law," Sec. 17, p. 23.

It follows from the Court's findings of fact that plaintiff's claims 12 to 19, inclusive, are valid, and are paramount to the claims of all other parties, since the territory embraced by the claims has never been open to relocation since May of 1952.

This determination, however, does not by any means end the controversy. Next to be decided is the question of what territory is, in fact, embraced by plaintiff's claims 12 to 19. More particularly, the focal point of the lawsuit revolves around the question of whether the mine operated by Duncan is located on plaintiff's claim No. 12.

Plaintiff contends that her witnesses, Archie B. Pickell, Lawrence Cates, L. D. Priddy, Herman B. Heath, Paul Ferguson, Rohn F. Drye, Jr., and Howard G. Schoenike, established that the north line of plaintiff's claim No. 12 was north of the Duncan mine. This contention cannot be sustained. The evidence fell far short of establishing the north line of claim 12 to be north of the Duncan mine. To begin with, the surveys made by plaintiff's witnesses as well as by defendants' witnesses established that the Duncan mine was more that 600 feet north of the east-west center line of Section 36, Township 3 South, Range 28 West, in Polk County, Arkansas. Thus the mine unquestionably is north of the north line of plaintiff's claim No. 12 if the descriptions contained in plaintiff's recorded location notices are correct. Plaintiff seeks to avoid the effect of the surveys by contending that the description was incorrect and that the north line of claim 12 was, in fact, laid out and marked north of the place where the Duncan mine is now located. As above stated, however, the evidence does not support this contention.

Pickell testified positively that his discovery was in the center of claim 12 and was 300 feet north of the center of Section 36, and further that the south line of claim 12 is on the east-west center line of Section 36.

On cross-examination, plaintiff's witness, Lawrence Cates, testified that Duncan did not mine south of the north line of plaintiff's claim 12 and that a red painted line near the mine was about 90 feet north of the line Cates surveyed. Cates also testified that Duncan moved its tool house north of the red line at the request of Pickell.

Plaintiff's witness, L. D. Priddy, testified that in 1955 he and Homer Legate ran the north line of claim 12 south of the Duncan mine and quit because they thought they had lost the line.

Plaintiff's witness, Herman B. Heath, had no personal knowledge of the location of the north line of plaintiff's claim 12.

Plaintiff's witnesses, Rohn F. Drye, Jr., and Howard G. Schoenike, had no personal knowledge of the location of plaintiff's claim 12, and their testimony was based on statements made to them by Pickell and others.

Not only did plaintiff's witnesses fail to establish that the north line of claim 12 is north of the Duncan mine, but also there was other evidence disputing this contention of plaintiff. For example, in December of 1956 Pickell, acting for plaintiff, employed Darrel Evans to survey plaintiff's claim 12 to determine whether the mine being operated by Duncan was on plaintiff's claim 12. Evans determined that the north line of claim 12 was slightly south of the pit being mined by Duncan, and Pickell told Evans he thought the survey was correct.

Plaintiff contends that the north line of her claim 12 is the northernmost blazed line shown on the plat prepared by her engineer, Rohn F. Drye, Jr. (Plaintiff's Exhibit 17.) This line is more than a thousand feet north of the east-west center line of Section 36, and the Court is convinced that it is not the north line of plaintiff's claim 12. In the opinion of the Court this line, in

fact, is the north line of Wood and Lawrence claim 5.

■ It is true, as plaintiff contends, that ordinarily the monuments and markings on the ground control over courses, distances, and descriptions in location notices. Silver King Coalition Mines Co. v. Conkling Mining Co., 255 U.S. 151, 162, 41 S.Ct. 310, 65 L.Ed. 561; Book v. Justice Mining Co., C.C.Nev., 58 F. 106, 115. But as heretofore stated, the Court is convinced that plaintiff's claim 12 was not in fact located on the ground in such a manner as to make the north line north of the Duncan pit.

■ As a matter of fact, if such were the case, plaintiff would be in no better position because the recorded location notices would be void as failing to properly identify the claims. Title 30 U.S.C.A. § 28, requires that records of mining claims shall contain "such a description of the claim or claims located by reference to some natural object or permanent monument as will identify the claim." The only means of identification of plaintiff's claim 12 (as well as claims 13 to 19, inclusive) is that it begins at the center of Section 36. If the north line of plaintiff's claim 12 were, in fact, located at the point contended by plaintiff, 1,010 feet north of the center of Section 36, the southeast or starting point of the claim (to which all other claims are tied) would be 410 feet north of the center of the section. In other words, plaintiff's entire block of 8 claims would be 400 feet north of the location described in the location notices. A variance of such magnitude would be sufficient to invalidate the notices for failure to properly identify the claim. Compare, Vevelstad v. Flynn, 9 Cir., 230 F.2d 695, 700.

Either through the action of the elements or the action of other persons, monuments placed by Pickell upon plaintiff's claims 12 to 19 and other markers and notices have been so obliterated or destroyed that it is impossible at the present time to follow, with any degree of accuracy, all the lines of said claims. Nevertheless the Court is confident that plaintiff's claims 12 to 19 were actually marked on the ground in substantial accord with the descriptions contained in plaintiff's location notices, and plaintiff must be held to those descriptions. In no other manner can the Court ever resolve the conflicts in these overlapping claims and settle the title, and thus give some stability to the unfortunate situation.

■ One thing additional should be mentioned regarding plaintiff's contention that the north line of her claim 12 is north of the Duncan mine. The silence and inactivity of plaintiff and her predecessors from January of 1955 until the instant suit was filed in May of 1957 speak more forcibly than the witnesses who testified at the trial. During this period Price and Grant, the Chapmans, and Duncan were engaged in mining operations at the site of the present Duncan mine. If plaintiff's claim 12 had in fact encompassed the mine, it seems incredible to the Court that plaintiff and her predecessors would have sat idly by for a period of almost 2-1/2 years before instituting this lawsuit. This factor, when considered in the light of the other evidence, sounds the death knell to plaintiff's contention that her claim 12 embraces the Duncan mine.

### Ratliff-Hillard-Walker Claims

The claims of Ratliff, Hillard, and Walker were filed on May 17, 1954, and are second in point of time to plaintiff's claims. These claims were properly located, and assessment work was done for the assessment year ending July 1, 1955. However, no assessment work was done for the assessment year ending July 1, 1956.

■ Ratliff, Hillard, and Walker contend that Price was in possession of the claims, holding leases from them, during the assessment year ending July 1, 1956, and that the work done by Price

should inure to their benefit. But Price did not purport to operate under the leases from Ratliff, Hillard, and Walker and did not purport to do assessment work for them. At all times Price was working for Wood and Lawrence, and the assessment work he did was for their benefit. There was no evidence whatsoever that Ratliff, Hillard, or Walker did any assessment work for the year ending July 1, 1956, and thus the area embraced by their claims was open to relocation as of July 1, 1956, at 12 o'clock meridian.

■ Ratliff, Hillard, and Walker have never re-entered their claims for the purpose of resuming assessment work, and their purported claims are no longer valid.

#### Claims of Wood and Lawrence

As stated earlier in this opinion, Wood and Lawrence contended that their claims were actually located in January of 1952. The Court has found they were not in fact located until January of 1955, and that in any event they would not be effective until then since location notices were not filed until January 12, 1955, in accordance with the custom in Polk County, Arkansas.

■ As of January 1955 the territory embraced by the Ratliff-Hillard-Walker claims was not open to relocation, and thus the claims of Wood and Lawrence, insofar as they conflict with the Ratliff-Hillard-Walker claims were invalid in their inception. Belk v. Meagher, 104 U.S. 279, 284, 26 L.Ed. 735; George Rose Smith, "Arkansas Mining and Mineral Law," p. 27. Thus, Wood and Lawrence claims 5 and 6 were completely invalid at the time they were filed, and claims 1, 2, 3, and 4 were invalid insofar as they conflicted with the Ratliff, Hillard, and Walker claims. Likewise, the territory embraced by the plaintiff's claims 12 to 19 was not open to relocation, and the Wood and Lawrence claims, insofar as they conflict with plaintiff's claims, were invalid in their inception. But, insofar as the Wood and Lawrence claims did not conflict with the claims of plaintiff and the claims of Ratliff, Hillard, and Walker, the Court is of the opinion that Wood and Lawrence claims 1, 2, 3, and 4 were valid and that the required assessment work has been done since January of 1955.[1]

#### Claims of Duncan, Dieckman & Duncan

Duncan's claims were located on November 2, 1956. At that time the claims of Ratliff, Hillard, and Walker had expired for failure to do the assessment work for the assessment year ending July 1, 1956, and the territory covered by the claims was subject to relocation. Also, as of November 2, 1956, plaintiff's claims were valid, and Wood and Lawrence claims 1 to 4, insofar as they did not conflict with the Ratliff-Hillard-Walker claims were valid, and were not subject to relocation. But the Duncan claims include substantial territory not included in the claims of plaintiff or Wood and Lawrence, and the Court is of the opinion that the Duncan claims, insofar as they do not conflict with the claims of plaintiff and Wood and Lawrence, are valid.

■ The only defects urged by the opposing parties as defeating the Duncan claims are (1) that Duncan did not make a "discovery" of the ore, and (2) that the Duncan notices of location describe all three claims rather than merely one claim per notice. With regard to the first question, in making a relocation, the relocator is not required to make a new discovery of ore; it is sufficient if the relocator finds evidence of the presence of minerals in sufficient quantities to justify the development thereof. See, 58 C.J.S. Mines and Minerals § 87, p. 148. As to the fact that the notices of location described all

---

1. There was some testimony concerning an attempt by Wood and Lawrence to amend their claims and to add a claim No. 17. Such amendments were never recorded as required by the custom in Polk County, Arkansas, and are completely ineffective for all purposes.

three claims, the Court is of the opinion that this is not a fatal defect and, in any event, the notices of location would be subject to amendment to correct the possible error, if any, especially since Duncan was in possession of and actively mining the claims from July 1956 until the Government ceased buying the ore in March 1958.

### Summary

In summary, the Court has concluded that plaintiff's claims 12 to 19 are valid and that the territory included in said claims is that described in the location notices; that Wood and Lawrence claims 5 and 6 are invalid, but that claims 1 to 4, insofar as they do not conflict with plaintiff's claims, are valid; that Duncan's claims 1 to 3 are valid insofar as they do not conflict with the claims of plaintiff and the claims of Wood and Lawrence; and that the claims of Ratliff, Hillard, and Walker have expired for failure of the locators to do the necessary assessment work.

Since the defendants have not been mining ore from plaintiff's claims, the complaint of plaintiff, insofar as plaintiff seeks money damages, should be dismissed.

Similarly, since the Court has found that plaintiff's claim 12 is valid and that the north line is close to the Duncan pit, Pickell was justified in requesting Duncan to move its building and equipment to the north, and the counterclaim of Duncan, insofar as it seeks money damages from plaintiff, should be dismissed.

The counterclaim of the Chapmans, insofar as they seek money damages against plaintiff, should also be dismissed since there was a genuine dispute as to the location of plaintiff's claim 12, and plaintiff is not legally responsible for any loss sustained by the Chapmans as a result of the Government's refusal to purchase any more ore from the Duncan mine because of the questionable state of the title.

There were several motions pending at the time of the trial, and the Court deferred action on the motions until the conclusion of the trial. Some of the motions were already moot at that time, and the remaining motions have been rendered moot by the decision of the Court on the merits. As is commonly the case in nonjury trials, a decision on the merits has made it unnecessary for the Court to pass on these motions.

The net effect of the Court's holding in this case is that Duncan is the only party having a valid claim embracing the Duncan mine. Nevertheless, it is the Court's understanding that Duncan, since it holds under the Chapmans and Wood and Lawrence, admits an obligation to pay royalties to said parties. This, however, is a collateral matter not involved in this lawsuit. All the Court is determining here is the validity and priority of the specific claims in litigation.

### Conclusions of Law

**1.**

The Court has jurisdiction of the parties and the subject matter herein.

**2.**

Plaintiff's claims 12 to 19, inclusive, are valid and title to said claims should be quieted in plaintiff as against all the defendants. The territory embraced by plaintiff's claims is that described in Pickell's location notices filed on May 7 and 8, 1952. The beginning point of these claims is the center of Section 36, Township 3 South, Range 28 West, in Polk County, Arkansas, and the Court has found that the center of the Section is the point surveyed and marked by the engineer, James D. Mickle, and shown on defendant's Exhibit 2.

**3.**

Wood and Lawrence claims 1 to 4, inclusive, insofar as they do not conflict with plaintiff's claims 12 to 19, are valid, and title to that portion of said claims not conflicting with plaintiff's.

claims should be quieted in Wood and Lawrence as against all other parties.

In other words, the north line of Wood and Lawrence claims 3 and 4 will be located on the east-west center line of Section 36 as surveyed by the engineer, Mickle. And the northwest corner of Wood and Lawrence claim 2, insofar as it conflicts with plaintiff's claim 12 will be reduced to conform with plaintiff's claim 12 and to eliminate the conflict.

Wood and Lawrence claims 5 and 6 were invalid in their inception, and should be set aside and held for naught.

### 4.

The claims of Ratliff, Hillard, and Walker have lapsed for failure of the locators to do the assessment work, and said claims should be set aside and held for naught.

### 5.

The claims 1, 2, and 3 of Duncan insofar as they do not conflict with the claims of plaintiff and the valid claims of Wood and Lawrence are valid, and title should be quieted in Duncan as against all other parties. Duncan claim 2 conflicts with Wood and Lawrence claims 1 and 2, and should be reduced in size to eliminate the conflict. Duncan claim 1 conflicts with plaintiff's claim 12, and should be reduced in size to eliminate such conflict. Duncan claim 3 conflicts with plaintiff's claims 12 and 13, and should be reduced in size to eliminate such conflict.

### 6.

No party is entitled to recover money damages from any other party, and each party should be required to pay his, her, or its own costs.

The complaint of plaintiff insofar as it seeks money damages should be dismissed. Likewise, the counterclaims of Duncan and the Chapmans insofar as they seek money damages should be dismissed.

A judgment in accordance with the above should be entered.

