427 P.2d 540

Bernardo C. VELASCO, Mary A. Beard, a widow, Juana C. Velasco, a widow, George P. Bartlett, Rudolph C. Velasco, Louise Adams, a widow, Silas W. Lehmer, plaintiffs in 13,538–B, and Bernardo C. Velasco and Consuelo P. Velasco, his wife, and Frank M. Calderon, plaintiffs in 13,539–B, Appellants,

v.

Guy MALLORY, Appellee.
John L. Splane, Applicant for Intervention and Appellant.*

No. 2 CA–CIV 246.

Court of Appeals of Arizona.

April 27, 1967.

Rehearing Denied June 12, 1967.

Review Denied Sept. 21, 1967.

Verity & Smith, by Victor H. Verity and Leo N. Smith, Tucson, for appellants.

Lesher, Scruggs, Rucker, Kimble & Lindamood, by E. F. Rucker, Tucson, for appellee.

Rees, Estes & Browning, by Paul G. Rees, Jr., Tucson, for intervenor-appellant.

HATHAWAY, Chief Judge.

This case involves two appeals arising out of an action to quiet title to unpatented mining claims. The trial court treated the matter as a possessory action between the parties. Bagg v. New Jersey Loan Co., 88 Ariz. 182, 354 P.2d 40 (1960); Bowen v. Chemi-Cote Perlite Corp., 5 Ariz.App. 28, 423 P.2d 104 (1967).

Appellants, Bernardo C. Velasco, et al., initiated an action in the superior court in Gila County, seeking to quiet title to unpatented lode mining claims known as the Chilito claims situated in the Banner Mining District, Gila County, Arizona. The Velascos filed a second action in the same court, seeking to quiet title to the Chilito Extension Groups, located in the same district and county.

Appellee, Guy Mallory, the only answering defendant in both actions, denied the Velascos' ownership and counterclaimed in both actions seeking to have title quieted in his overlying Black Eagle group of unpatented lode mining claims. The Velascos replied to the counterclaims, denying Mallory's claimed conflicting interest. The cases were consolidated and tried to the court. They remain consolidated in this appeal.

At trial, after all the evidence was in, Mallory moved to dismiss the Velascos'

complaints and moved for judgment on the counterclaims. The Velascos moved to dismiss Mallory's counterclaims for failure to join a co-owner of the Black Eagle claims (Casias), contending he was an indispensable party to the counterclaims. The Velascos' trial counsel withdrew prior to entry of judgment. Their present counsel did not participate in the trial. The court ruled for Mallory and judgment was entered establishing that the Black Eagle group of claims was prior to the Velasco claims.

The judgment was vacated on motion of the Velascos. An amended judgment was entered resizing the Black Eagle claims and establishing that as between Mallory and the Velascos, the Black Eagle group of claims was prior. Title to the Velascos' Chilito and Chilito Extension groups was quieted in the Velascos except the areas included within the resized Black Eagle group. The Velascos moved for a new trial. This appeal is from the amended judgment and from the denial of the motion for a new trial.

John L. Splane, alleged co-owner of the Black Eagle mining claims, seeks review of the court's refusal to allow him to intervene after conclusion of the trial.

The litigation concerns an area where one Anton Hogvall, since deceased, had previously located mining claims starting in 1905 through approximately 1935. The Velascos' predecessors in interest had located four claims in 1937. In 1948 the four claims were amended and 17 additional claims were located. These claims known as the "Chilitos" were located before, and the Chilito Extension group was located after Mallory's.

Mallory's Black Eagle claims, located by his predecessors in interest in 1953, overlap and conflict with major portions of the Velascos' claims. The following diagram depicts the position of the claims. The Hogvall and the original Black Eagle dimensions are as indicated. All other claims are standard size, 600 feet by 1500 feet.

Chilito Claims _____ . _____ . _____

Black Eagle Claims _____
Before Resizing
   (Previously Hogvall Claims)

Black Eagle Claims __ __ __ __ __
Resized

At trial, the Velascos claimed: (1) that the Chilito claims were located before the Black Eagle claims and, (2) that the assessment work had been performed on the Chilitos for the assessment year ending prior to the location of the Black Eagle claims.

Mallory maintained: (1) that, due to the existence of the Hogvall claims, the area within the Black Eagle claims was closed to location at the time of location of the Velascos' claims; (2) that the Hogvall claims were abandoned prior to location of the Black Eagle claims; (3) that the location work performed upon the Velascos' claims was insufficient, or that the assessment work was inadequate.

In studying the record, we have considered the evidence in the light most favorable to sustain the judgment.

The following questions are presented for decision:

1. Is a nonjoined co-owner an indispensable party to a quiet title action?

2. Must a locator, such as Mallory, claiming areas within a prior location (Chilitos) prove the validity of third party (Hogvall) claims relied upon to defeat the prior location?

3. Was the evidence sufficient to establish an abandonment or forfeiture of the Hogvall claims before relocation of the Black Eagle group?

4. Must the Hogvall claims be resized first to determine which area was available for relocation?

## FAILURE TO JOIN CO-OWNER

■ John L. Splane's interest was acquired by quitclaim deed from V. L. Burns, who had previously been dropped as a party defendant. Splane attempted to intervene after trial and after a minute entry order that judgment was to be entered in favor of Mallory. The Velascos join with him in his contention that he should have been permitted to intervene. At the pretrial conference the parties entered into the following stipulation:

"Plaintiffs and defendants stipulate that the complaints may be dismissed as to the following parties: V. L. Burns, and unknown heirs of Tom C. Casias."

The Velascos having joined in this stipulation are bound and are precluded from raising the question on appeal:

"Objections to the omission of an indispensable party or necessary party may ordinarily be raised for the first time in the appellate court unless the complaining party himself is responsible for such defect."

39 Am.Jur. Parties § 5. See also 67 C.J.S. Parties § 126.

■ Splane contends that as a matter of law he was entitled to intervene, that his intervention was timely, and that the judgment subsequently entered directly and injuriously affected his real property rights and left title to the property "in a confused condition." He claims a right to intervene under Rule 24 of the Arizona Rules of Civil Procedure, 16 A.R.S., providing for intervention of right and permissive intervention.

"24(a) Intervention of right. Upon timely application anyone shall be permitted to intervene in an action:

"1. When a statute confers an unconditional right to intervene.

"2. When the representation of the applicant's interest by existing parties is

or may be inadequate and the applicant is or may be bound by a judgment in the action.

"3. When the applicant is so situated as to be adversely affected by a distribution or other disposition of property which is in the custody or subject to the control or disposition of the court or of an officer thereof.

"24(b) Permissive intervention. Upon timely application anyone may be permitted to intervene in an action:

"1. When a statute confers a conditional right to intervene.

"2. When an applicant's claim or defense and the main action have a question of law or fact in common.

"In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

Splane complains that the judgment creates a cloud on his record title and " * * * creates false impression * * *" as to his position regarding ownership. This argument is groundless in view of the care of the superior court judge in limiting the issues. The amended judgment provided that the issues were "limited solely to the claims of the plaintiffs against the defendant, Guy Mallory, and that the rights of no other than said persons are involved."

■ Splane points out that if the excess of the oversized claims is discarded without joinder of the other co-owners, " * * * then theoretically the other two people may later choose entirely separate areas, or a court in a later action might well determine that the boundaries of the claim were different then those determined in the initial action * * *." We have not been shown how Splane is actually injured or adversely affected by this judgment, nor do we believe that he is or can be. His distress lies in problems which at this stage are imaginary. We will not render advisory opinions anticipative of troubles which do not exist; may never

exist; and the precise form of which, should they ever arise, we cannot predict. 5 C.J.S. Appeal and Error § 1455; Phoenix Metals Corp. v. Roth, 79 Ariz. 106, 284 P.2d 645 (1955).

■ A tenant in common may maintain an action to remove a cloud from the common property without joining his co-tenant. 74 C.J.S. Quieting Title § 55, p. 78; McCleary v. Broaddus, 14 Cal.App. 60, 111 P. 125 (1910); See 61 Colum.L.Rev. 1254 (1961); 30 So.Calif.L.Rev. 80 (1957). The trial court, having acquired jurisdiction over the parties and their respective interests in the property through due process, had the power to render the limited judgment that was given.

Apparently the trial judge recognized Splane as a permissive intervenor asserting a claim having questions of law and fact in common with the main action. In denying the attempted intervention after trial, the trial court properly exercised its discretion in keeping with the admonition in Rule 24(b), Arizona Rules of Civil Procedure, that " * * * the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." The trial court's action is supportable on the theory that the parties before it should not be deprived of justice because of an attempted intervention. Splane can still have his day in court.

## PROOF OF VALIDITY OF THIRD PARTY CLAIMS RELIED UPON TO DEFEAT PRIOR LOCATION

■ Except for the areas included within the resized Black Eagle claims, which were awarded to Mallory, the Chilito and Chilito Extension claims, including the excess trimmed from the Black Eagle claims, were awarded to the Velascos. We assume from the findings implicit in the judgment that the trial court found the Hogvall claims to be valid and subsisting at the time of the location of the Chilitos. It follows that the court also found that the Hogvall claims were forfeited or abandoned prior to the

relocation of the Black Eagles. It also follows that the Chilitos, insofar as they were found to trespass upon the Hogvalls, were found to be void.

The Velascos contend that Mallory, as a subsequent locator, must prove the validity of third party claims relied upon by him to defeat the Velascos' prior locations. Their attack in this area is directed to the lack of evidence of mineral discovery on the Hogvall claims. The appellants contend that the record does not support a finding that the Hogvall claims were valid. They base this contention on the claimed absence from the record of proof of a discovery for the Hogvall claims. We believe the following testimony, elicited from Bernardo Velasco during redirect examination, is pertinent:

"Q Mr. Velasco, a few minutes ago when counsel asked you a question regarding whether or not you went on the property and found some location holes for the Black Eagles you stated you found some old holes. Will you explain that further?

* * * * * *

"A The majority of the holes that were used to locate the Black Eagle group were old holes that were freshened up and cleaned up and that I played in back in 1934, '35, '36 and 1937.

"Q How can you tell an old hole from a new hole?

"A Very easily. Anybody that has had any experience, an old hole would be—well, it will show erosion and would show, the sun would deteriorate it, and a fresh hole will show fresh ground even up to two or three years.

"Q Now, these claims supposedly located in July 1, 1953—when did you next go on these claims to look at this work if you recall?

"A In 1953, the latter part of 1953, and in 1954 and '55.

"Q Now, Mr. Velasco, there are six Black Eagle claims, and could you tell how many were old holes, but

cleaned out, and how many were new holes?

"A Very clearly, yes.

"Q How many were old holes?

"A At least four or five of them were old holes. I would say five.

"Q Would you say on which ones were the old holes?

"A There were old holes on what they call their Black Eagle No. 4, Black Eagle No. 3, and Black Eagle No. 2 and their Black Eagle No. 1. On the Black Eagle No. 5 and No. 6 they used old open cuts that were prospecting holes by Mr. Hogvall. They were freshened up to make them look like they were new."

Counsel had previously stipulated that that there " * * * is ore in place and was discovered at the time of the location of each claim on all the claims in question." See Hagan v. Dutton, 20 Ariz. 476, 480, 181 P. 578 (1919). A mining engineer testified that mineral outcroppings ran all the way through the country. Another witness testified that there was "definite mineralization over all that whole country." In view of the stipulation and the testimony we believe there is substantial evidence supporting a discovery for each of the Hogvall claims.

" * * * when the controversy is between two mineral claimants, the rule respecting the sufficiency of a discovery of mineral is more liberal than when it is between a mineral claimant and one seeking * * * an agricultural entry, for the reason that where land is sought to be taken out of the category of agricultural lands the evidence of its mineral character should be reasonably clear, while in respect to mineral lands, in a controversy between claimants, the question is simply which is entitled to priority."

Chrisman v. Miller, 197 U.S. 313, 25 S.Ct. 468, 49 L.Ed. 770 (1905); 2 Lindley on Mines, 3d ed., par. 336; Hagan v. Dutton, supra; also see 1 American Law of Mining § 4.53, p. 684.

## DID MALLORY PROVE ABANDONMENT OR FORFEITURE OF HOGVALL CLAIMS PRIOR TO LOCATION OF BLACK EAGLE CLAIMS?

■ Belk v. Meagher, 14 Otto 279, 104 U.S. 279, 26 L.Ed. 735 (1881), venerable mining law precedent, gives guidance in the area of overlapping claims. We recently considered the ancient mining law precept, there enunciated, that the right to possession follows a valid location. Bowen v. Chemi-Cote Perlite Corp., supra. Belk v. Meagher, supra, enunciated other mining precepts which have become doctrine. The following principles from that doctrine come into play in the Velasco-Mallory controversy: A valid mining claim is not open to relocation until the rights of a prior locator have ended. Until the prior locator's rights have ended, the attempted relocation is a nullity.

Mallory's case was premised upon the validity of the Hogvall claims at the time of location of the Chilitos, contend the appellants. Therefore, if the record contains sufficient evidence to support their validity, it was incumbent upon Mallory to prove that the ground became open to relocation, by abandonment or forfeiture of the Hogvall claims, prior to location of the Black Eagle claims. Otherwise, the Black Eagle claims would also be void as an attempted relocation on a valid and subsisting claim. In such case, the Velascos claim that their position is superior, because they were in possession before the locators of the Black Eagle claims.

■■ The parties agree that abandonment consists of the subjective intention to abandon coupled with an external and objective act. 58 C.J.S. Mines and Minerals § 78. Proof of abandonment or forfeiture lies with the party asserting the fact and it must be established by clear and convincing evidence. 58 C.J.S. Mines and Minerals §§ 79 and 82, p. 141; 2 American Law of Mining §§ 8.4 and 7.22.

We have searched the record and find it barren of proof of intent to abandon the

Hogvall claims. Over Velasco's objection, Mallory elicited testimony from Judge T. J. Mahoney, relating to statements made to him, when he was a practicing attorney representing Mrs. Mallory, by the attorney for the estate of Anton Hogvall. The testimony was to the effect that the attorney for the estate was having difficulty locating the administrator and also that the estate was not willing to sell the claims at a price presumably offered by the witness on behalf of his client. We are of the opinion that the testimony was clearly hearsay, and even if it were admissible, proved no intent to abandon.

▆ The judgment is supported, however, by the following testimony, which came in without objection, establishing a forfeiture of the Hogvall claims for nonperformance of the annual assessment work for the assessment year ending in 1952.

Mrs. Marion Mallory testified that she and Tom Casias had "possession" of the Hogvall claims on a lease in 1951 to 1952. The following testimony was also given by her:

"Q  Now, when did that lease expire?

"A  That lease expired January 4, 1952.

"Q  All right, after that lease expired what did you do in relation to the Hogvall claims?

"A  Tried to renew the lease.

"Q  You heard Judge Joe Mahoney testify yesterday?

"A  Yes, I did.

"Q  Is what his testimony was—is that substantially as you remember what occurred?

"A  Yes."

▆ Judge Mahoney had testified that he had informed Mrs. Mallory to wait and determine whether or not the assessment work was performed on the Hogvall claims and if not she was advised to relocate them. Mrs. Mallory's testimony incorporating by reference Judge Mahoney's testimony and received without objection is in the case for all purposes. "Such evidence [hearsay evi-

dence] is sufficient to establish a fact and may be given the value of direct and competent evidence." Arizona Law of Evidence, Udall § 12, p. 24; McCormick on Evidence § 54, p. 126.

The following testimony was also elicited from Mrs. Mallory:

"Q  All right, did you go in possession of those mines, of those claims on July 1, 1953?

"A  I went to relocate them July 1, 1953.

"Q  What did you do?

"A  I relocated in 1953, *but I lived on the claims from 1951 to 1953 with Tom Casias,* between the ranch and the mine.

"Q  You went to the claims July 1, 1953?

"A  That's right.

"Q  At what time of the day did you arrive there?

"A  I arrived there about twelve—a little after twelve."

(Emphasis supplied)

This testimony, that she lived on the claims would indicate that she was in a good position to observe whether or not assessment work was performed on the Hogvall claims during the assessment year in question. Supportive of a finding that the assessment work was not performed in the assessment year ending in 1953 was her affirmative answer that Judge Mahoney's testimony was substantially her memory of what had occurred.

Documents, representing the proceedings in the Hogvall estate, were admitted into evidence. The decree of distribution was admitted upon stipulation. In the final account and report and petition for distribution, the six Hogvall claims were listed, with the indicated value, "none." The claims are absent from the decree of distribution, which is further supportive of a finding of forfeiture. The only specific property itemized in the decree of distribution is the cash sum of $714.83. Had $600 of this sum been expended by the administrator for the performance of assessment work on mining claims considered worth-

less, he well might have been liable for negligence in wasting the estate property. The foregoing, coupled with the absence of an affidavit of labor for the Hogvall estate for the year in question, sufficiently supports a finding of forfeiture.

## MAY ONLY VALID PORTIONS OF OVERSIZED CLAIMS BE RELOCATED WHERE THIRD PARTIES ARE AFFECTED?

Finally, the Velascos contend: that even if the Hogvall claims were valid and subsisting when the Chilito claims were located, the judgment on Mallory's counterclaims cannot stand; since the Hogvall claims were oversized they were void, at least as to the excess and the excess was therefore open to relocation by third parties. They also argue that a mining claim overlapping a prior location is void only as to the area conflicting with the *valid* portions of the prior location. Any overlapping *Chilito* locations that were valid, appellants maintain, would acquire areas within the Hogvall boundaries that were legally excessive. Appellants also contend that portions of the Black Eagles ran outside of the Hogvall boundaries. There is testimony that the Black Eagle claims were coextensive with the Hogvall claims, and as indicated by the testimony of Earl Sparks, a mining surveyor and engineer:

"Q   As a result of the things you did to determine the position of the Hogvall claims on the ground, as you have testified, did you impose those Hogvall claims on this particular map which is defendants' Exhibit 'A'?

"A   Yes, I did.

"Q   And what relationship do they show to the Black Eagles that you surveyed?

"A   They in all cases are lying on the Black Eagles— the Black Eagles are lying on them."

Had the Hogvalls and the subsequent Black Eagles been so excessive as to show bad faith, they would have been void. 58 C.J.S. Mines and Minerals § 44 (2); 1 American Law of Mining §§ 5.16 and 5.17, pp. 752, 757. The question is a factual one for the trial court which we will not disturb if supported by the record. We believe that the finding of good faith implicit in the judgment is supported by the evidence. The rugged topography and the explanation of the difficulty in placing certain of the monuments within legal limits supports the finding of good faith.

The oversized claims being valid, Hogvall's possession as well as that of the owners of the subsequent Black Eagles extends to the entire claim. Adams v. Yukon Gold Co., 9 Cir., 251 F. 226 (1918). Hogvall and the owners of the Black Eagles were not given notice nor opportunity to resize the claims. Until this is done, where a claim is excessive due to honest mistake, the whole claim including the excess is "   *   *   *   so far segregated from the public domain as to exempt it or any part thereof from relocation." Jones v. Wild Goose Mining & Trading Co., 9 Cir., 177 F. 95 (1910). Mallory argues that the Velascos have no cause for complaint for the reason that the overlapping portions of the Chilito claims having initiated through trespass is a nullity, Adams v. Yukon Gold Co., supra; Eagle-Picher Mining & Smelting Co. v. Meyer, 68 Ariz. 214, 204 P.2d 171 (1949). However, review of the validity of the trial court's "quieting title" to the excess in the Velascos is not sought, so we are not called upon to consider it.

For the reasons stated, the judgment is affirmed.

MOLLOY and KRUCKER, JJ., concur.