286 P.3d 518

**Julie YOUNG, a married woman dealing with her separate property, Plaintiff/Appellant,**

**v.**

**Jason ROSE and Jordan Rose, husband and wife, Defendants/Appellees.**

No. 1 CA–CV 10–0786.

Court of Appeals of Arizona, Division 1, Department B.

Sept. 25, 2012.

Poli & Ball P.L.C. By Michael N. Poli, James B. Ball, Phoenix, Attorneys for Plaintiff/Appellant.

Rose Law Group P.C. By Brian M. Bergin, Kenneth M. Frakes, Scottsdale, Attorneys for Defendants/Appellees.

DOWNIE, Judge.

¶ 1 Julie Young appeals the dismissal of her breach of contract action against Jason and Jordan Rose (collectively, "the Roses").[1] The superior court ruled that Young's real estate employment agreement with the Roses was unenforceable because she did not sign it. We agree that Young was statutorily required to sign the agreement and that it is unenforceable without her signature. We therefore affirm that aspect of the superior court's ruling.

¶ 2 The superior court also rejected Young's contention that she signed the agreement electronically. In doing so, however, the court relied on matters outside the pleadings, requiring it to treat the Roses' Rule 12(b)(6) motion as one for summary judgment. Because the parties were not notified that the motion to dismiss would be converted to a motion for summary judgment and did not receive an opportunity to present material relevant to such a motion, we vacate that portion of the judgment.

## FACTS AND PROCEDURAL HISTORY[2]

¶ 3 Over an 18–month period beginning in April 2006, the Roses and Young, a licensed real estate agent, entered into three "Buyer–Broker Agreements" naming Young as the Roses' "exclusive real estate agent." The third agreement expired in October 2007.

¶ 4 On January 11, 2009, Young sent an e-mail message to Jordan Rose regarding four properties possessing some of the Roses' "wish list" amenities, though each exceeded the desired purchase price of "under $4,000,000." The e-mail inquired whether Jordan wanted Young to preview the properties and provide additional information. Jordan responded by e-mail the next day, asking Young to "keep us posted" regarding two of the properties "if the prices drop." Later that same day, Young e-mailed Jordan to say that the price of one property had decreased to $4,475 million, and the owner would consider offers under $4 million. Young also asked Jordan to sign a new Buyer–Broker Agreement because they were "back into the exploration mode." Young attached a portable document format (PDF) version of the agreement to her e-mail message. Jordan forwarded that e-mail message to her assistant, with the direction to "pls print and have us sign and get back to Julie."

¶ 5 On January 14, 2009, Jordan's assistant sent an e-mail message to Young, apologizing for the "delay" and attaching "the signed

---

1. We refer to the Roses by their first names when necessary to distinguish between them.

2. In the context of a motion to dismiss brought pursuant to Arizona Rules of Civil Procedure ("Rule") 12(b)(6), we "assume the truth of the well-pled factual allegations and indulge all reasonable inferences therefrom." *Cullen v. Auto–Owners Ins. Co.*, 218 Ariz. 417, 419, ¶ 7, 189 P.3d 344, 346 (2008) (citations omitted).

agreement" (the "2009 Agreement"). The next day, Young e-mailed Jordan's assistant, saying simply, "Thank you" ("thank you e-mail").

¶ 6 All of Jordan's e-mail messages to Young included an electronic business card with Jordan's name, firm logo, address, telephone numbers, and website addresses. Similarly, all of Young's e-mail messages ended with an electronic business card consisting of her name, business address, e-mail address, telephone numbers, website address, and photograph.

¶ 7 The 2009 Agreement identifies "Jason Rose, Jordan Rose" as buyers and Realty Executives as broker, with Young as its agent. The agreement authorizes Realty Executives to act as the Roses' exclusive broker from January 12, 2009, through July 12, 2009, in their efforts to locate a "lot or home in [zip codes] 85018 or 85253." Jordan and Jason Rose each hand-signed the 2009 Agreement. Young did not manually sign the agreement.

¶ 8 During the term of the 2009 Agreement, the Roses purchased a home within the 85253 zip code, using a real estate agent other than Young. The Roses paid that agent a commission. Young thereafter sued the Roses for breach of contract, seeking to recover the commission set forth in the 2009 Agreement.

¶ 9 The Roses moved to dismiss Young's complaint pursuant to Rule 12(b)(6). They contended there was no enforceable contract because neither Young nor Realty Executives had signed the 2009 Agreement, as required by Arizona Revised Statutes ("A.R.S.") section 32–2151.02(A)(4).[3] Young opposed the motion, arguing A.R.S. § 32–2151.02 is a "regulatory statute" that does not bar a civil cause of action and that the Roses' signatures on the 2009 Agreement

satisfied the statute of frauds. Young also claimed she had in fact signed the 2009 Agreement by virtue of the thank you e-mail, which was "intended to be [her] signature and acceptance of the contract" pursuant to the Arizona Electronic Transactions Act (the "Act"). *See* A.R.S. §§ 44–7001 through – 7052.

¶ 10 After briefing and oral argument, the superior court granted the motion to dismiss. Young timely appealed. We have jurisdiction pursuant to A.R.S. § 12–2101.

## DISCUSSION

### I. The 2009 Agreement is Unenforceable Without Young's Signature.

¶ 11 Young concedes that she was required to sign the 2009 Agreement pursuant to A.R.S. § 32–2151.02(A), which reads:

All real estate employment agreements shall:

1. Be written in clear and unambiguous language.

2. Fully set forth all material terms, including the terms of broker compensation.

3. Have a definite duration or expiration date, showing dates of inception and expiration.

4. *Be signed by all parties to the agreement.*

(Emphasis added.)

¶ 12 Young also admits that the 2009 Agreement is "unlawful" unless the thank you e-mail qualifies as an electronic signature. But she argues the contract is nonetheless enforceable in a civil action, even if unlawful. We disagree.

¶ 13 A real estate employment agreement is "a written agreement by which a real estate broker is entitled to compensa-

---

**3.** On appeal, the Roses focus solely on Young's alleged failure to sign the 2009 Agreement. We therefore do not address whether, even assuming a valid electronic signature by Young, the agreement is nevertheless unenforceable because the broker failed to sign, review, or initial it. *See* A.R.S. § 32–2151.01(G) (requiring a broker to review transactional documents within ten days of execution, and initial and date the "instrument on the same page as the signatures of the par-

ties"); A.A.C. R4–28–1103(A) (requiring employing brokers to supervise salespersons, and review and manage real estate employment agreements); Arizona Department of Real Estate Substantive Policy Statement No. 2005.06 (defining "transaction" records to include "buyer-broker agreements"), *available at* http://www.re.state.az.us/LawBook/Documents/SPS_Documents/SPS_2005.06_Electronic_Record_Keeping.pdf.

tion for services rendered pursuant to § 44–101, paragraph 7." A.R.S. § 32–2151.02(E). Arizona places "strict requirements" on real estate professionals who seek to recover commissions. *Olson v. Neale,* 116 Ariz. 522, 524, 570 P.2d 209, 211 (App.1977). "The legislature has enacted comprehensive legislation to regulate the ... conduct of real estate salesmen and brokers.... to protect the public *and render judicial relief unavailable for the recovery of a commission which would be in violation of the law.*" *Realty Execs. v. Northrup, King & Co.,* 24 Ariz.App. 400, 402, 539 P.2d 514, 516 (1975) (emphasis added) (citing *Bonasera v. Roffe,* 8 Ariz.App. 1, 442 P.2d 165 (1968)).

¶ 14 Young argues A.R.S. § 32–2151.02 is merely a regulatory statute that should not be "elevate[d]" to the same stature as the statute of frauds. According to Young, compliance with the statute of frauds is sufficient.

¶ 15 Arizona's statute of frauds, A.R.S. § 44–101, addresses several types of agreements. It reads, in relevant part:

> No action shall be brought in any court in the following cases unless the promise or agreement upon which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged, or by some person by him thereunto lawfully authorized:
>
> ....
>
> 7. Upon an agreement authorizing or employing an agent or broker to purchase or sell real property, or mines, for compensation or a commission.

¶ 16 The 2009 Agreement complies with the statute of frauds. Section 44–101(7), though, is not the only statute dictating requirements for real estate employment agreements. Section 32–2151.02(A)(4), as previously noted, requires such agreements to be "signed by *all parties* to the agreement." (Emphasis added.) The question thus becomes whether a failure to comply with this statutory mandate would render the 2009 Agreement unenforceable.

¶ 17 Arizona statutes setting requirements for real estate employment agreements should be read in harmony. "*In*

*pari materia* is a rule of statutory construction whereby the meaning and application of a ... portion of a statute is determined by looking to statutes which relate to the same ... thing and which have a purpose similar to that of the statute being construed. Statutes *in pari materia* must be read together and all parts of the law on the same subject must be given effect, if possible." *Collins v. Stockwell,* 137 Ariz. 416, 419, 671 P.2d 394, 397 (1983) (citing *Ariz. Gunite Builders, Inc. v. Cont'l Cas. Co.,* 105 Ariz. 99, 459 P.2d 724 (1969)). The legislature expressly referred to A.R.S. § 44–101 in the more recently enacted A.R.S. § 32–2151.02(E), further demonstrating the propriety of reading these statutes together. *Cf. Prudential v. Estate of Rojo–Pacheco,* 192 Ariz. 139, 149, 962 P.2d 213, 223 (App.1997) ("We presume that when the legislature enacts a statute, it is aware of existing statutes, and [w]here a later statute does not expressly repeal a former one, they should be construed so as to give effect to each, if possible.") (internal quotation marks omitted).

¶ 18 We disagree with Young's contention that non-compliance with A.R.S. § 32–2151.02(A)(4) merely provides a basis for regulatory action against a licensed real estate professional, but poses no impediment to a civil action for unpaid commissions. Although a question of first impression in the context presented, past decisions offer guidance.

¶ 19 In *Red Carpet–Barry & Associates v. Apex Associates,* a real estate broker sued to recover a commission allegedly owed by sellers with whom he had a contract. 130 Ariz. 302, 303, 635 P.2d 1224, 1225 (App.1981). The sellers moved to dismiss, arguing the written agreement was unenforceable because it lacked an expiration date. *Id.* The superior court agreed and dismissed the complaint. *Id.* On appeal, this Court affirmed. *Id.* We relied on then-existing rules of the real estate department, which we noted "have the force and effect of law," stating:

> The rules of the real estate department at the time this contract was made require that all real estate listings be in writing and that each listing agreement have a definite expiration date.... Since this rule

is applicable to this contract, then the contract cannot be enforced since it is unlawful.

*Id.* at 304, 635 P.2d at 1226.

¶ 20 *Red Carpet–Barry* was not the first Arizona decision to apply requirements for real estate employment agreements beyond those dictated by the statute of frauds. In *Olson,* the issue was whether a current listing agreement was a "condition precedent to recovery of a sales commission." 116 Ariz. at 523, 570 P.2d at 210. The court first analyzed the requirements under the statute of frauds. *Id.* at 523–24, 570 P.2d at 210–11. It then considered rules of the Real Estate Commission, which at the time mandated a written listing agreement with a "definite expiration date." *Id.* at 525, 570 P.2d at 212. Viewing these legal requirements in tandem, the court concluded:

> Taken together, it seems to us that the public policy of this State is that brokers, in order to collect a commission, must have a written listing, that the listing must contain a definite expiration date, and the listing agreement shall be deemed to cancel automatically on that date.

*Id.*

¶ 21 Since the *Olson* and *Red Carpet–Barry* decisions, the legislature has codified the regulatory rules at issue in those cases in A.R.S. § 32–2151.02(A). The legislature also added the requirement that all parties sign real estate employment agreements. Obviously, a statute like A.R.S. § 32–2151.02(A) can have no less "force and effect of law," *Red Carpet–Barry,* 130 Ariz. at 304, 635 P.2d at 1226, than the administrative rules considered in our earlier decisions.

¶ 22 *Young* implicitly urges us to depart from our holding in *Red Carpet–Barry.* We decline to do so. In enacting A.R.S. § 32–2151.02 in 1995, the legislature presumably knew that Arizona's appellate courts had historically interpreted our statutes as imposing legal requirements on real estate professionals' contracts beyond those in the statute of frauds. *See State v. Pennington,* 149 Ariz. 167, 168, 717 P.2d 471, 472 (App.1985) (appellate courts presume the legislature is aware of existing case law when it enacts a statute) (citing *Daou v. Harris,* 139 Ariz. 353, 678

P.2d 934 (1984) ). The legislature could have countermanded these judicial holdings when enacting § 32–2151.02, but it did not do so.

¶ 23 Even if a statutory conflict existed, the requirements of A.R.S. § 32–2151.02 would apply. The Chapter 20 provision relates specifically to real estate employment agreements. Section 44–101 is a more general statute, covering nine different types of agreements. *See Evans v. Young,* 135 Ariz. 447, 449, 661 P.2d 1148, 1150 (App.1983) (when reconciling a general and a specific statute, courts "harmonize the two statutes if possible," but "the special statute prevails" if they conflict).

¶ 24 Read together, our statutes establish that a real estate agent may sue to recover compensation due under a real estate employment agreement only if there is a written agreement that complies with both A.R.S. §§ 44–101(7) and 32–2151.02(A). The result in this case may appear harsh, especially because the parties to be charged—the Roses—signed the 2009 Agreement. *But see Gray v. Kohlhase,* 18 Ariz.App. 368, 371, 502 P.2d 169, 172 (1972) (quoting *Pac. Sw. Dev. Corp. v. W. Pac. R.R. Co.,* 47 Cal.2d 62, 301 P.2d 825 (1956)) ("Although denial of a commission ... may seem harsh, Plaintiff is a licensed real estate broker and, as such, is presumed to know" the law). Both sides articulate policy arguments supporting their respective positions. Ultimately, though, it is within the legislative province to dictate the requirements for enforceable real estate employment agreements. Should the legislature wish to permit civil enforcement of real estate employment agreements that violate A.R.S. § 32–2151.02(A), it may do so through statutory amendments.

## II. The Electronic Signature Dispute Could Not be Resolved Under Rule 12(b)(6).

¶ 25 Under the Act, an electronic signature "satisfies any law that requires a signature." A.R.S. § 44–7007(D). Unlike the pure issue of law resolved *supra,* whether Young electronically signed the 2009 Agreement is a question that cannot be answered in the context of a Rule 12(b)(6)

motion. In deciding such a motion, "courts look only to the pleading itself and consider the well-pled factual allegations contained therein." *Cullen*, 218 Ariz. at 419, ¶ 7, 189 P.3d at 346. "Ordinarily, reliance on evidence extrinsic to the pleadings requires the court to treat the motion to dismiss as a motion for summary judgment." *Dube v. Likins*, 216 Ariz. 406, 417 n. 2, ¶ 34, 167 P.3d 93, 104 n. 2 (App.2007). If parties present matters outside the pleadings, Rule 12(b) directs:

> If, on a motion asserting the defense numbered 6 to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

¶ 26 Although the Roses attached a copy of the 2009 Agreement to their motion to dismiss, that action did not convert the Rule 12(b)(6) motion into one for summary judgment. *See Cullen v. Koty–Leavitt Ins. Agency*, 216 Ariz. 509, 513, ¶ 8, 168 P.3d 917, 921 (App.2007) (a contract "central to the plaintiff's claim" is not a matter outside the pleadings for purposes of Rule 12(b)(6)), *vacated in part by Cullen*, 218 Ariz. at 421, 189 P.3d at 348. Young's response, on the other hand, included copies of numerous e-mail messages. As the Roses noted in their reply to the motion, these documents were matters outside the pleadings. Moreover, the attachments encompassed more than the one e-mail message purportedly containing Young's electronic signature, which arguably could be viewed as part of the underlying contract.

¶ 27 Both sides discussed the extrinsic documents in some depth below. The superior court relied on them as well, stating:

> The January 15, 2009 e-mail saying simply "Thank you" is insufficient to constitute an

electronic signature. The name and photograph are essentially identical to, for instance, those closing her lengthy e-mail of January 11, which plainly do not constitute a signature on a contract; and logically, an electronic signature to the message "Thank you" is no different than a physical note, "Thank you, (signed) Julie Young," which would not constitute a signature on the contract whose return she was thanking the sender for.

¶ 28 When a trial court does not exclude matters outside the pleadings, a motion to dismiss under Rule 12(b)(6) "shall" be treated as one for summary judgment, with all parties having a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." That did not occur here.

¶ 29 Determining whether the thank you e-mail qualifies as an electronic signature necessarily entails review of matters outside the pleadings. The statutory definition of "electronic signature" is broad, encompassing "an electronic sound, symbol or process that is attached to or logically associated with a record and that is executed or adopted by an individual with the intent to sign the record." A.R.S. § 44–7002(8).

¶ 30 In addition to proving the existence of an electronic signature, Young must also establish that the parties agreed to conduct the transaction by electronic means, A.R.S. § 44–7008(A), which is "determined from the context and surrounding circumstances, including the parties' conduct." A.R.S. § 44–7005(B). Resolving these types of issues is not possible based solely on the complaint and the 2009 Agreement. Nor can our appellate review extend to an analysis of the superior court's ruling under summary judgment standards. The parties did not have an opportunity to submit affidavits or other evidence relevant to the electronic signature issue, as contemplated by Rule 12(b).[4]

---

4. The superior court noted that Young did not specifically allege an agreement by the Roses to conduct the transaction electronically. We are not persuaded that such an allegation was necessary to withstand dismissal under Rule 12(b)(6). Moreover, before dismissing on Rule 12(b)(6) grounds, if requested, "the non-moving party should be given an opportunity to amend the complaint if such an amendment cures its defects." *Wigglesworth v. Mauldin*, 195 Ariz. 432, 439, ¶ 26, 990 P.2d 26, 33 (App.1999). Young requested such an opportunity.

¶ 31 We leave for another day the task of determining when an e-mail communication qualifies as an electronic signature. That topic has generated significant discussion and diverging viewpoints among courts and commentators. *See, e.g., Cunningham v. Zurich Am. Ins. Co.*, 352 S.W.3d 519, 530 (Tex.App. 2011) ("We decline to hold that the mere sending ... of an e-mail containing a signature block satisfies the signature requirement when no evidence suggests that the information was typed purposefully rather than generated automatically, that [the sender] intended the typing of her name to be her signature, or that the parties had previously agreed that this action would constitute a signature."); *Int'l Casings Grp., Inc. v. Premium Standard Farms, Inc.*, 358 F.Supp.2d 863, 873 (W.D.Mo.2005) (despite no typed name, each e-mail message included "a header with the name of the sender," which was sufficient to satisfy the signature requirement under Missouri's version of the UCC and Uniform Electronic Transactions Act); Uniform Electronic Transactions Act (1999) § 2, cmt 7 ("A digital signature using public key encryption technology would qualify as an electronic signature, as would the mere inclusion of one's name as part of an e-mail message-so long as in each case the signer executed or adopted the symbol with the intent to sign."); *cf. Parma Tile Mosaic & Marble Co. v. Estate of Fred*, 87 N.Y.2d 524, 640 N.Y.S.2d 477, 663 N.E.2d 633, 635 (1996) (programmed imprint of sender's name insufficient to authenticate every document faxed; an intent to authenticate the specific writing at issue must be demonstrated).

¶ 32 We recognize that this substantive issue may arise on remand. However, without a more fully developed record, we would be required to hypothesize about possible factual scenarios to provide meaningful guidance. Appellate courts should not render "advisory opinions anticipative of troubles which do not exist; may never exist and the precise form of which, should they ever arise, we cannot predict." *Citibank v. Miller & Schroeder Fin., Inc.*, 168 Ariz. 178, 182, 812 P.2d 996, 1000 (App.1990) (quoting *Velasco v. Mallory*, 5 Ariz.App. 406, 410–11, 427 P.2d 540, 544–45 (1967)).

## CONCLUSION

¶ 33 We affirm the superior court's determination that Young was required to sign the 2009 Agreement for it to be enforceable. We vacate the portion of the judgment concluding that Young did not sign the agreement electronically and remand for further proceedings consistent with this opinion. We deny both sides' requests for attorneys' fees incurred on appeal, without prejudice to the superior court's ability to award appellate fees to the party that ultimately succeeds on the merits. Because each side has partially prevailed on appeal, neither is the successful party for purposes of an appellate costs award.

CONCURRING: PETER B. SWANN and DONN KESSLER, Judges.